Barbara **KENNEDY**, Appellant–
Petitioner,

v.

Douglas **KENNEDY**, Appellee–
Respondent.

No. 82A01–9703–CV–74.

Court of Appeals of Indiana.

July 28, 1997.

Transfer Denied Dec. 4, 1997.

David W. Kent, Shively & Kent, Evansville, for Appellant–Petitioner.

Michael C. Keating, Keating, Bumb, and Vowels, P.C., Evansville, for Appellee–Respondent.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Barbara Kennedy ("Grandmother") appeals from the trial court's denial of her petition for visitation with her grandson, B.K.

We affirm.

### ISSUES

Grandmother presents two issues for our review which restate as:

1. Whether the trial court violated Grandmother's right to due process.

2. Whether the trial court abused its discretion when it denied Grandmother's petition for visitation.

### FACTS

B.K. is the son of Douglas Kennedy ("Father") and his first wife. Father has full custody of B.K. Father and B.K. had lived with Grandmother, Father's mother, sporadically throughout B.K.'s life. In May of 1995, the relationship between Father and Grandmother began to deteriorate. Grandmother told B.K. on several occasions that Father was preventing her from seeing him. Those statements led to frequent disagreements between Father and Grandmother.

Over the next several months, Father and Grandmother continued to disagree about Grandmother's lack of visitation with B.K. and about Father's care of him. Father suggested to Grandmother that they attend counseling together. Father was specifically concerned with the parties' difficulties in communicating constructively with each other. However, Grandmother refused to attend voluntary joint counseling. At that point, Father was still arranging periodic visitation for Grandmother with B.K., but he insisted on being present during those visits.

In December of 1995, Grandmother petitioned the trial court for visitation rights with B.K. The evidence presented to the court demonstrates that Grandmother has a history of psychological problems. In 1988, she attempted suicide by taking an overdose of sleeping pills, after which she received counseling and was prescribed an anti-depressant. In October of 1995, Grandmother began to stockpile her medication, and her counselor suspected that she was again considering suicide. The counselor contacted Grandmother's daughter, Kathleen, who then went to her home and discovered that Grandmother had rewritten her will and had written a letter to B.K. Kathleen confronted Grandmother who refused to relinquish the drugs. Kathleen called the police, and Grandmother was eventually hospitalized.

After a hearing, the trial court issued an order which stated in relevant part:

That because of the dysfunctional relationship existing between the grandmother

and the father, it would not be in the best interest of the child to order visitation at this time. The Court directs the parties to contact either [Southwestern Indiana Mental Health Center] or Family and Children's Services for counseling to see if the problems in their relationship can be resolved. Upon receipt of a report showing that the problems have been resolved, the Court will make a final ruling on the grandmother's petition.

IT IS THEREFORE CONSIDERED, ORDERED, ADJUDGED and DE-CREED at this time that there not be visitation and that the parties are ordered to contact [Southwestern Indiana Mental Health Center] or Family and Children's Services for counseling to see if the problems in their relationship can be resolved, and the court will make a final ruling on the grandmother's petition for visitation, after said report is received.

Grandmother, Father and B.K. complied with the court's order and met with a clinical social worker who then issued a report to the court. The court then made the following entry:

Court having received a report from [Southwestern Indiana Mental Health Center], which said report indicates there has been no progress made in resolving difficulties between the grandmother and the father which further indicates that the grandmother is adopting a rigid and irre-tractable position; court's original order will stand in that any visitation by the grandmother will be determined by the father.

Grandmother appeals from that judgment.

## DISCUSSION AND DECISION

### Standard of Review

■■■ The Indiana Grandparent's Visitation Act (the "Act") provides that a grandparent may petition for visitation rights if the marriage of the child's parents has been dissolved in Indiana. IND.CODE § 31–1–11.7–2(a)(2). The Act further states:

(a) Visitation rights may be granted when the court determines that it is in the best interests of the child.

(b) In determining the best interests of the child under this section, the court may consider whether a grandparent has had, or has attempted to have, meaningful contact with the child.

IND.CODE § 31–1–11.7–3. Determining the best interests of the child is committed to the sound discretion of the trial court and will be reversed on appeal only upon a showing of an abuse of discretion. *Walker v. Chatfield,* 553 N.E.2d 490, 493 (Ind.Ct.App.1990). An abuse of discretion exists where the trial court's decision is clearly against the logic and effect of the facts and circumstances before the trial court or the reasonable, probable deductions to be drawn therefrom. *Id.* We will not reweigh the evidence or judge the credibility of the witnesses. *Id.*

■■■ Because Grandmother had the burden of proof at trial, she appeals from a negative judgment. *See Buckland v. Reed,* 629 N.E.2d 1241, 1245 (Ind.Ct.App.1994). A party appealing from a negative judgment must show that the evidence points unerringly to a conclusion different from that reached by the trier of fact. *Id.* We will reverse a negative judgment only if the decision is contrary to law. *Id.* In examining whether the decision is contrary to law, we must determine whether the undisputed evidence and all reasonable inferences to be drawn therefrom lead to but one conclusion and the trier of fact has reached a different one. *Id.*

### Issue One: Due Process

■■■ Grandmother contends that the trial court erred when it relied upon a report submitted by the mental health center without conducting another hearing. Specifically, Grandmother argues that because the Indiana Grandparent's Visitation Act does not require the court to conduct a hearing upon receipt of an investigative report, it violates her right to due process under the Fourteenth Amendment to the United States Constitution. We cannot agree.[1]

---

**1.** In a related argument, Grandmother cites to Indiana Code § 31–1–11.5–22 for the proposition that the court must provide the parties an oppor-tunity to examine the veracity and probity of any

 The Fourteenth Amendment prohibits any state deprivation of life, liberty, or property without due process of law. *Ingraham v. Wright*, 430 U.S. 651, 672, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711, 730 (1977). A two-step analysis is required to determine whether principles of due process apply. First, we must ask whether the asserted individual interests are encompassed within the Fourteenth Amendment's protection of "life, liberty or property." If protected interests are implicated, we must then decide what procedures constitute "due process of law." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484, 494 (1972). The range of interests protected by procedural due process is not infinite. *Board of Regents v. Roth*, 408 U.S. 564, 570, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548, 556–57 (1972). The Supreme Court has repeatedly rejected the notion that any grievous loss visited upon a person by the state is sufficient to invoke the procedural protections of the Due Process Clause. *Meachum v. Fano*, 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451, 458 (1976). To determine whether due process requirements apply in the first place, we must look not to the "weight" but to the nature of the interest at stake. *Roth*, 408 U.S. at 570–71, 92 S.Ct. at 2705–06, 33 L.Ed.2d at 557.

The "liberty interest" guaranteed by the Amendment has not been defined with exactitude, but it includes:

> [T]he rights of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of [one's] own conscience, and generally *to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.*

*Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042, 1045 (1923) (emphasis added). Thus, the threshold question here is whether the common law recognized the grandparent-grandchild relationship as "essential to the orderly pursuit of happiness by free men."

 At common law, parents were afforded the right to control the upbringing, education and religious training of their children. *See Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042. Accordingly, a parent cannot be deprived of his or her parental rights without due process of law. In contrast:

> Grandparents had no legal right to visit their grandchildren under the common law. While parents may have had a moral obligation to allow visitation, the failure to adhere to such a moral code left the grandparents with no legal recourse. Using a derivative rights theory, the grandparents' right derives from and is secondary to the parents' right so grandparents could visit only with the permission of the grandchild's parents. Courts were reluctant to enforce visitation contrary to the parental wishes.

30 Fam.L.Q. 753, 757 (1996); *see also* 59 Am.Jur. 2d *Parent and Child*, § 27 (1987); 67A C.J.S. *Parent and Child* § 41 (1978).

All fifty states have enacted legislation that provides grandparents with some form of visitation rights. *See* 30 Fam.L.Q. at 753. Although those statutes differ from state to state, they generally recognize that a child's best interest is often served by developing or maintaining contact with his or her grandparents. In light of this legislative movement, "[I]t is fair to say that the law increasingly acknowledges and respects the relationship between grandparent and grandchild and has recognized certain rights and duties which flow from such a relationship." *Ward v. Ward*, 537 A.2d 1063, 1067 (Del.Fam.Ct.1987).

 Notwithstanding these statutory provisions, grandparents do not possess a cognizable liberty interest in visitation with their grandchildren. Although a handful of

---

reports submitted to and considered by the court. *See also Jendreas v. Jendreas*, 664 N.E.2d 367, 370 (Ind.Ct.App.1996). However, Indiana Code

§ 31–1–11.5–22 only applies to child custody proceedings.

cases have afforded grandparents due process rights with respect to their grandchildren, a careful examination of those cases reveals that a liberty interest exists only where the grandparent-grandchild relationship is essentially a custodial one. *See, e.g., Ellis v. Hamilton*, 669 F.2d 510 (7th Cir. 1982), *cert. denied* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982) (adoptive grandmother, who served as de facto mother had liberty interest in continued custody of several children); *see generally Ward*, 537 A.2d at 1067–68.[2]

Grandmother has failed to demonstrate that her interest in continued contact with B.K. gives rise to due process considerations. The trial court in this case conducted an adversarial hearing at which Grandmother was able to present and challenge evidence. That procedure was adequate. In the absence of a liberty interest, the court's failure to subject the mental health center's report to a hearing did not violate the right to due process.

### Issue Two: Denial of Visitation Rights

▮ Grandmother contends that the trial court abused its discretion when it denied her petition for visitation. Specifically, she argues that the trial court erred when it focused solely on the relationship between Father and Grandmother and not on the relationship between Grandmother and B.K. We disagree.

In *Daugherty v. Ritter*, 646 N.E.2d 66, 68 (Ind.Ct.App.1995), *adopted* and *incorporated by reference*, 652 N.E.2d 502 (Ind.1995), we held that the plain language of the Act provides that the court may properly consider the contact between the grandparent and grandchild but that such consideration is discretionary. We reasoned, "Although a trial court should ordinarily consider such contact as one of the factors in determining whether

visitation is in the best interests of the child, the use of the permissive 'may' clearly indicates it is not required to do so." *Id.;* IND. CODE § 31–1–11.7–3. Thus, the trial court was not obligated under the statute to consider the relationship between Grandmother and B.K. in making its determination.

Grandmother argues that this conclusion is contrary to our decision in *Moses v. Cober*, 641 N.E.2d 668 (Ind.Ct.App.1994), in which we stated that the focus of the trial court in determining a grandparent's visitation rights should be the relationship between the grandparent and grandchild. However, we clarified that holding in *Daugherty* where we explained:

> That focus, however, is the starting point, not the ending one, in the trial court's best interest analysis. The ultimate question is whether visitation in the face of family discord is in the child's best interest. That question can only be answered by looking at the totality of the circumstances presented. While the relationship may, in any given case, be sufficient to make grandparent visitation in the child's best interest, notwithstanding the dissension between the parent and grandparent, it may not be sufficient to overcome the effects of the discord on the child in another.

*Daugherty*, 646 N.E.2d at 68.

Here, the trial court determined that because of the "dysfunctional relationship" between Father and Grandmother, it would not be in B.K.'s best interest to order visitation. The record indicates that Grandmother repeatedly criticized Father to B.K. and told him that Father was to blame for the family's discord. Father also testified that he had difficulty in communicating with Grandmother and that she had refused to honor Father's wishes regarding B.K.'s upbringing. Even after the court-ordered counseling, the

---

**2.** The Supreme Court has indirectly explained the logic behind the custody/visitation distinction:

> [T]he importance of the familial relationship, to the individuals involved and to society, stems from the emotional attachments that derive from the intimacy of daily association, and

from the role it plays in "promoting a way of life" through the instruction of children.

*Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 844, 97 S.Ct. 2094, 2109, 53 L.Ed.2d 14, 35 (1977) (citations omitted).

parties were unable to resolve their problems. Further, Grandmother's mental and emotional health is questionable.

From this evidence, the trial court could have properly concluded that the acrimony between Father and Grandmother was unhealthy for B.K., regardless of the meaningful contact that he may have had with Grandmother in the past. Considering the totality of the circumstances, the court did not abuse its discretion when it denied Grandmother visitation rights.

Affirmed.

ROBERTSON and SULLIVAN, JJ., concur.